M.H. By, Through and with His Parents and Next Friends, Mr. and Mrs. H. Plaintiffs,

v.

**BRISTOL BOARD OF EDUCATION,** et al., Defendants.

No. 3:98CV867.

United States District Court, D. Connecticut.

Aug. 29, 2001.

David C. Shaw, Andrew Alan Feinstein, Richard T. Roznoy, Law Offices of David C. Shaw, Hartford, for M. H., by & through his parents & next friends, Mr & Mrs H., plaintiffs.

Scott M. Karsten, Sack, Spector & Karsten, West Hartford, Christopher Brigham, Updike, Kelly & Spellacy, P.C., New Haven, for Bristol Bd of Ed, Katherine Bourgault, Walter Ives, Edward Maher, Lisa Palangi, Katie Wininger, Michael Wasta, Betty Marchesi, defendants.

## *RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

COVELLO, Chief Judge.

This is an action for damages. It is brought pursuant to 42 U.S.C. § 1983,[1] the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"),[2] and common law tenets concerning assault, intentional infliction of emotional distress and negligence. The plaintiff, a disabled minor with Down's syndrome, alleges that the defendant, the Bristol board of education, and its employees violated his rights in connection with his education in the Bristol school system. The defendants now move for summary judgment, arguing that there are no material issues of fact in dispute and that they are entitled to judgment as a matter of law.[3]

The issues presented are: (1) whether the plaintiff may assert a cause of action for damages pursuant to 42 U.S.C. § 1983 based upon violations of the IDEA; (2) whether the use of physical and mechanical restraints on the plaintiff, a disabled student, which was not authorized by the plaintiff's individualized education plan and was without parental consent, violated the student's substantive due process rights; (3) whether the plaintiff received an adequate remedy following the deprivation of his property and liberty interests to satisfy the requirements of procedural due process; (4) whether the plaintiff has sufficiently shown that a policy or custom of the defendant board of education caused his injury; (5) whether the plaintiff has sufficiently demonstrated the personal involvement of the supervisory defendants in his alleged injuries; (6) whether the individual defendants are entitled to qualified immunity; and (7) whether the individual defendants are entitled to sovereign immunity for the plaintiff's state law causes of action.

The court concludes: (1) that a plaintiff may bring a cause of action for damages pursuant to 42 U.S.C. § 1983 based upon violations of the IDEA; (2) that the use of physical and mechanical restraints on the plaintiff constitutes a violation of the plaintiff's substantive due process rights where there is no evidence that such action was taken pursuant to standards of professional judgment; (3) that the plaintiff received an adequate post-deprivation hearing in state administrative actions to satisfy the requirements of procedural due process; (4) that the plaintiff has not sufficiently shown that the defendant board of education's policy or custom caused his alleged injury for purposes of municipality liabili-

1. Title 42 of the United States Code, section 1983, states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...." 42 U.S.C. § 1983.

2. The Individuals with Disabilities Education Act, 42 U.S.C. § 1400 *et seq.,* requires that states receiving federal funding provide children with disabilities a "free appropriate public education." 20 U.S.C. § 1412.

3. This action is brought by a minor, M.H., by and through his parents, Mr. and Mrs. H. For purposes of this discussion, the court will refer to M.H. as "the plaintiff."

ty; (5) that the plaintiff has not sufficiently shown the personal involvement of some of the individual defendants for purposes of supervisory liability; (6) that the individual defendants are not entitled to qualified immunity; and (7) that the individual defendants are entitled to sovereign immunity for the plaintiff's state law causes of action.

For the reasons stated herein, the defendants' motion for summary judgment is granted in part and denied in part.

## FACTS

Examination of the complaint, affidavits, pleadings, exhibits, supplemental materials, and Rule 9(c) statements discloses the following undisputed, material facts:

At all times relevant to this case, the plaintiff, M.H., was a fourteen-year old student in the sixth grade at Memorial Boulevard Middle School in Bristol, Connecticut. M.H. has Down's syndrome and is severely mentally retarded. He is essentially non-verbal and possesses an IQ of less than 36. The Bristol board of education has provided M.H. with special education services since 1985. Under the provisions of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), the Bristol board of education is required to develop an individualized education plan for M.H. This plan is developed during regular planning and placement team ("PPT") meetings in which M.H.'s parents, Mr. and Mrs. H., participate.

During the 1995–96 school year, the defendants, Lisa Palangi, a special education teacher, and Betty Marchesi, a paraprofessional, were assigned to work with M.H. On or about May 7, 1996, Palangi spit water onto M.H.'s face and stated "this is spitting," in response to M.H.'s acts of misbehavior. Marchesi was present in the classroom at the time and witnessed this spitting incident. Neither Palangi nor

Marchesi reported this incident to their supervisors. When M.H. returned home that day from school, his mother observed that his hair was "soaking." Palangi sent a note home with M.H. which stated that she and M.H. had been playing hairdresser and she gave him a new hairstyle. On May 8, 1996, one Elizabeth Knoblauch, a paraprofessional working at the school, overheard Marchesi talking about the incident. Knoblauch then reported the incident to the defendant, Katherine Bourgault, the supervisor of special education.

On May 10, 1996, the defendant, Edward Maher, superintendent of schools, sent Palangi a letter advising her that she was being suspended without pay. That evening, Palangi telephoned Mr. and Mrs. H. at home and told them she had "squirted" water in M.H.'s face the week prior. Palangi explained that she was in danger of being fired, and asked Mr. and Mrs. H. to speak to school officials on her behalf.

On May 13, 1996, school officials conducted a meeting to discuss Palangi's employment. Palangi, Maher, and the defendant, Walter Ives, the principal of Memorial Boulevard Middle School, were present at the meeting, along with other school and union representatives. Although Mr. and Mrs. H. were not present for portions of the meeting, they were allowed to speak and stated that Palangi had been a "good teacher," and that she had "helped their son a great deal." After the meeting, Mrs. H. learned more details about the May 8th incident, including the fact that Palangi had intentionally spat on M.H.'s face, and had not "squirted" water at him as previously reported to her. Mrs. H. discovered that Marchesi had witnessed the spitting incident and that neither she nor Palangi had reported the incident to school officials. In addition, Mrs. H. learned that Palangi had often restrained

M.H. in a chair during the school day as a means of controlling him when Marchesi was not present in the classroom. Palangi restrained M.H. with a belt around his waist which was then secured to a chair. When Marchesi would return to the classroom, Palangi would release M.H. Mr. and Mrs. H. both stated that they were not previously informed of the use of restraints nor had they consented to such measures.

Sometime thereafter, the defendant, Katie Wininger, a special education teacher, was assigned to M.H. as Palangi's replacement. On May 21, 1996, Mrs. H. visited the school and observed Wininger physically restraining M.H. Specifically, Wininger held both of M.H.'s arms from behind and forcibly restrained him. M.H. resisted, and a physical struggle ensued until Mrs. H. stepped in and calmed down M.H. Later that day, Mrs. H. wrote a letter to the defendant, Michael Wasta, director of pupil personnel services, describing the incident and voicing her concerns about the use of physical force. Mrs. H. sent a copy of the letter to Maher. Neither defendant responded to the letter. On May 24, 1996, Palangi resigned from her position.

On June 12, 1996, Wininger sent home a note to Mr. and Mrs. H., advising them about an incident involving M.H. during a fire drill at the school. When the fire alarm sounded, M.H. had become agitated and had to be physically removed from the building by Wininger and Marchesi. M.H. attempted to bite both women. In the altercation, both of M.H.'s arms were bruised. School officials knew prior to the incident that M.H. was agitated by fire alarms, but it is unclear whether his teachers were warned of the drill on that day.

On June 24, 1996, Mr. and Mrs. H. met with school officials for a PPT meeting. At that meeting, Bourgault showed Mr. and Mrs. H. a handwritten "behavior management plan" dated May 30, 1996, which was drafted based on a May 18, 1993 case report completed by a consultant (the "CREC report").[4] Mr. and Mrs. H. objected to those portion of the behavior management plan which permitted the use of physical restraint. The school officials agreed to put those measures on hold. Mrs. H. presented photographs of the bruises to M.H.'s arms resulting from the June 12th fire drill and requested that a report be filed about the incident.

On June 25, 1996, Mr. and Mrs. H. requested a state administrative hearing to discuss the school's summer program for M.H., pursuant to 20 U.S.C. § 1415[5] and Conn. Gen.Stat. § 10–76h.[6] On July 23, 1996, Mr. and Mrs. H. wrote to the defendant, Bourgault, about their concerns that their May 21st letter to the defendant, Wasta, about the spitting incident and the bruises M.H. suffered during the June 12th fire drill, went unanswered. On July 23, 1996, Mr. and Mrs. H. requested a second administrative hearing to determine whether M.H. was receiving a free and appropriate education in the least re-

**4.** Joanne Craig, a behavior analyst at the Capitol Regional Education Counsel, completed the behavioral assessment of M.H. and provided the defendants with a recommended behavioral management plan in 1993.

**5.** Title 20 of the United States Code, section 1415 states that "[w]henever a complaint has been received ... the parents involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1).

**6.** Section 10–76h of the Connecticut General Statutes sets forth the procedures for conducting the due process hearing, as required by 20 U.S.C. § 1415(f).

strictive environment pursuant to the IDEA provisions.

On August 9, 1996, a final decision and order was issued in the first state administrative hearing. On October 18, 1996, a final decision and order was issued in the second state administrative hearing. Mr. and Mrs. H. then brought two separate actions in the district court, pursuant to the IDEA, for reimbursement of the costs, expenses and attorneys fees they incurred in their administrative actions. On May 9, 1997, the parties settled both suits for the sum of $15,500.00.

On May 14, 1998, the plaintiff, through his parents, initiated the instant action. The first four counts of the complaint allege that the individual defendants, Bourgault, Ives, Maher, Palangi, Wininger, Wasta and Marchesi, and the Bristol board of education violated M.H.'s procedural and substantive due process rights, as well as the rights afforded to him under the IDEA. Counts five and six allege the common law torts of assault and intentional infliction of emotional distress against the defendants, Palangi and Wininger, for the spitting incident and the use of physical restraints. Count seven alleges that common law tort of negligence against the defendants, Palangi, Wininger and Marchesi.

## STANDARD

On a motion for summary judgment, the moving party must show that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56; *see D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(d). "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." *Zigmund v. Foster,* 106 F.Supp.2d 352, 356 (D.Conn.2000) (citations and quotation marks omitted). Furthermore, "[T]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to avoid the entry of judgment against the non-moving party]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[7]

---

**7.** The plaintiff argues that summary judgment is not appropriate on any of the counts because the "[p]laintiff has been denied all opportunity to conduct formal or informal dis-

covery since August 1999." Pursuant to the court's pretrial order, the period for formal discovery closed on November 10, 1998. On September 27, 2000 and October 10, 2000,

## DISCUSSION

### I. *FEDERAL CAUSES OF ACTION 42 U.S.C. § 1983*

The individual defendants and the Bristol board of education first argue that they are entitled to judgment as a matter of law on all of the plaintiff's federal causes of action, counts one through four of the complaint, brought pursuant to 42 U.S.C. § 1983. In the alternative, the individual defendants argue that they are entitled to qualified immunity because their actions did not constitute a knowing violation of the plaintiff's rights.

### A. THE IDEA

In counts one and three of the complaint, the plaintiff alleges that the board of education and the individual defendants violated his rights under the IDEA. The defendants argue that the plaintiff may not assert a cause of action for damages against any of the defendants for violations of the IDEA pursuant to 42 U.S.C. § 1983. Specifically, the defendants argue that "[t]he Act does not provide the basis for such a private cause of action" and that the plaintiff "cannot maintain a section 1983 action for alleged IDEA violations."

#### 1. *Statutory Background*

The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, "is the most recent Congressional enactment in 'an ambitious federal effort to promote the education of handicapped children.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). "Under the Act, states that receive funding from Congress are required to provide 'all children with disabilities' with a 'free appropriate public education.'" *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir.2000) (quoting 20 U.S.C. § 1412(a)(1)(A)).

"The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written individualized education plan ('IEP')." *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir.2000). The IEP must include, *inter alia*, statements of the child's level of performance, measurable goals and objectives for the year, the special education and services to be provided to the child and an explanation of the extent a child will not participate with nondisabled children in a regular classroom setting. 20 U.S.C. § 1414(d)(1)(A). Each IEP is developed by an "IEP team" which consists of the parents of the child, at least one regular education teacher, at least one special education teacher, and a member of

---

the court denied the plaintiff's two motions seeking an extension of the discovery period in this matter, concluding that the plaintiff has "had a fully adequate opportunity for discovery in this matter." *See Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989) ("[T]he trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery."); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 928 (2d Cir.1985) ("A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need.").

The plaintiff and his counsel, having had a full opportunity for discovery, cannot now argue that summary judgment is inappropriate because they decided, for whatever reason, not to pursue such an opportunity. Their repeated argument that they have "suffered from the deprivation of their rights to use the federal rules of discovery," is equally without merit, as it is the plaintiff's and counsel's own actions that have limited the amount of discovery that they have conducted.

the local educational agency. 20 U.S.C. § 1414(d)(1)(B). The child's parents may challenge the proposed IEP in an impartial due process hearing pursuant to the state's administrative procedures. 20 U.S.C. § 1415(f). Any party aggrieved by the decision of the state administrative agency may bring a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A). The reviewing court may award reasonable attorneys fees to the parents if they prevailed in the administrative proceedings. 20 U.S.C. § 1415(i)(3)(B).

### 2. Section 1983 Causes of Action for Violations of the IDEA

■ The defendants argue that the plaintiff cannot maintain a 42 U.S.C. § 1983 cause of action based upon violations of the IDEA. In response, the plaintiff argues that a private right of action pursuant to § 1983 based upon injuries suffered as a result of IDEA violations does exist, and that he is thus entitled to compensatory and punitive damages.

"It is well settled that § 1983 does not create any new substantive rights, but merely provides a federal cause of action for violations of certain federal rights." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 754 (2d Cir.1987). Section 1983 may be used to enforce statutorily created rights with two exceptions: § 1983 is not available "when Congress has foreclosed enforcement of the statute in the statute itself, or when a statutory remedial scheme is so comprehensive that there is an implication that it provides the exclusive remedy foreclosing all other remedies." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 754 (2d Cir.1987).

The IDEA itself provides that a district court may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). There is currently a split among the circuit courts regarding whether the IDEA provides the exclusive remedy for violations of its provisions, or whether § 1983 is available to assert a cause of action for damages. The fourth, sixth, seventh and eight circuits have all concluded that a plaintiff may not assert a § 1983 cause of action based upon alleged violations of the IDEA. *See Sellers v. School Bd. of City of Manassas*, 141 F.3d 524 (4th Cir.1998); *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 980 F.2d 382 (6th Cir.1992); *Charlie F. v. Board of Educ. of Skokie Sch. Dist.*, 98 F.3d 989 (7th Cir.1996); *Heidemann v. Rother*, 84 F.3d 1021 (8th Cir.1996). The third circuit, in *W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995), however, concluded that parents may seek monetary damages for violations of the IDEA pursuant to § 1983.

■ The second circuit has not yet addressed whether a § 1983 action may be based upon IDEA violations. However, in *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir.1983), the second circuit discussed the predecessor of the IDEA, the Education of the Handicapped Act, 20 U.S.C. § 1400 *et. seq.* (amended 1990)("EHA"), and concluded that § 1983 provided a vehicle to assert money damages when a plaintiff was deprived of the procedural safeguards of the EHA.[8] The court concluded that the plaintiff had a cause of action against the school district for compensatory damages based upon the school district's alleged policy of denying expensive special education services.

---

8. The EHA was amended in 1990 and renamed the Individuals with Disabilities Education Act. Because the EHA was the foundation for the IDEA, "cases which have addressed the rights of disabled children under the EHA remain precedent for interpretations of the IDEA." *Straube v. Florida Union Free Sch. Dist.*, 801 F.Supp. 1164, 1169, n. 1 (S.D.N.Y.1992).

*Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141, 148 (2d Cir.1983).

Following the *Quackenbush* decision, Congress amended the EHA in 1986 to provide that "[n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973[ ], or other Federal statutes protecting the rights of handicapped children and youth . . . ." 20 U.S.C. § 1415(f) (amended 1990). In enacting this provision, Congress expressly overruled the Supreme Court's decision in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), in which the Court concluded that the EHA provided the exclusive remedy to assert violations of the act. Congress stated that the enactment was to "reaffirm . . . the viability of . . . 42 U.S.C. § 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children." H.R.Rep. No. 296, 99th Cong., 1st Sess. 4 (1985). Thereafter, the second circuit concluded: "In light of this clear legislative history, we hold that parents are entitled to bring a § 1983 action based on the alleged violations of the EHA . . . ." *Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987); *see also Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 758 n. 1 (2d Cir.1998) ("Congress amended the EHA so that the statute now clearly provides that it is not the exclusive remedy.").

Like its predecessor, the EHA, the IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under . . . other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures set under subsec-

tions (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*). Recent decisions within this circuit support the conclusion that the IDEA may serve as the basis for a § 1983 cause of action for damages. *See Butler v. South Glens Falls Cent. Sch. Dist.,* 106 F.Supp.2d 414, 420 (N.D.N.Y. 2000); *R.B. v. Bd. of Educ. of City of New York,* 99 F.Supp.2d 411, 418 (S.D.N.Y. 2000); *Cappillino v. Hyde Park Cent. Sch. Dist.,* 40 F.Supp.2d 513, 515–16 (S.D.N.Y. 1999); *Searles v. Bd. of Educ. of Ellenville Central Sch. Dist.,* No. 96CV0637, 1999 WL 34983 (N.D.N.Y. Jan. 13, 1999).

The court concludes that the plaintiff may bring a cause of action pursuant to 42 U.S.C. § 1983 for the defendants' alleged violations of the IDEA. The second circuit, though not directly addressing this issue with respect to the IDEA, has nonetheless determined that the previous statutory scheme under the EHA allowed for an action for damages. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987). Congress has not "foreclosed enforcement of the [IDEA] in the statute itself," *id.* at 754, but rather has expressly provided in the IDEA that its provisions do not "restrict or limit the rights, procedures, and remedies available under . . . other Federal laws protecting the rights of children with disabilities . . . ." 20 U.S.C. § 1415(*l*). While the IDEA does provide remedial procedures for parents to challenge a proposed IEP, such procedures allow parents to recover only the costs of bringing such a challenge. *See* 20 U.S.C. § 1415(i)3(B). The provisions do not provide for a recovery of actual damages sustained by violations of the IDEA provisions. Thus, the remedial scheme of the IDEA is not "so comprehensive that there is an implication that it provides the exclusive remedy fore-

closing all other remedies." *Mrs W. v. Tirozzi,* 832 F.2d 748, 754 (2d Cir.1987).

The defendants' motion for summary judgment is, therefore, denied with respect to the plaintiff's causes of action for damages based on alleged violations of the IDEA, brought pursuant to 42 U.S.C. § 1983.

## B. SUBSTANTIVE DUE PROCESS

The board of education and the individual defendants next argue that they are entitled to judgment as a matter of law on counts one and two of the complaint, to the extent that they allege that the defendants violated M.H.'s substantive due process rights. Specifically, the defendants argue that the single spitting incident, the alleged "inappropriate" use of a seat restraint, and the two incidents of physical restraint of M.H. by Wininger are not so egregious as to "shock the conscience" and constitute a deprivation of M.H.'s rights.

In response, the plaintiff argues that he had a right to reasonable safety and freedom of restraint, which the defendants violated through their use of physical and mechanical restraints on M.H.

The Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth Amendment, is a limit on a State's power to act. *DeShaney v. Winnebago County Soc. Servs. Dep't,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Due Process Clause "was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression ... [and] to protect the people from the State ...." *Id.* at 196, 109 S.Ct. 998 (internal quotation marks and citations omitted). "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha*

*v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). The Supreme Court has recognized that "the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (quoting *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). In addition, the Court has recognized the " '[l]iberty from bodily restraint ... as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' " *Id.* (quoting *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)).

In a case involving mentally handicapped patients at a mental institution who had been involuntarily committed, the Supreme Court concluded that the physical restraint of the patients implicated their liberty interests in freedom from bodily restraint under the Due Process Clause. *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Court recognized that such an interest was not absolute because "there are occasions in which it is necessary for the State to restrain the movement of residentsfor example, to protect them as well as others from violence." *Id.* at 320, 102 S.Ct. 2452. To determine whether the use of physical restraints violated notions of substantive due process, the Court adopted a standard enunciated in the lower court's decision:

> We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of

safety and freedom from unreasonable restraints. He would have held that 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' *Id.* at 321, 102 S.Ct. 2452 (quoting 644 F.2d 147, 178 (3d Cir.1980)(Seitz, J., concurring)).

The Supreme Court concluded that decisions made by professionals were presumptively valid and that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).[9] Professionals may disagree about what course of conduct is best, but a court must "remember that the ultimate issue is whether the patients' basic liberty interests are being safeguarded, not whether the optimal course of treatment as determined by some expert is being followed." *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1248 (2d Cir.1984). "[C]onstitutional standards are met when the professional who made a decision exercised 'professional judgment' at the time the decision was made." *Id.*

The court concludes that the *Youngberg* test is the appropriate standard in this case for determining whether the defendants' violated M.H.'s substantive due process rights by their use of physical and mechanical restraints. *See Society for Good Will to Retarded Children,* 737 F.2d at 1245–46 (holding that *Youngberg* stan-

dard was appropriate to analyze whether students at state operated school for the mentally retarded were deprived of their right to freedom from undue bodily restraint); *see also Heidemann v. Rother,* 84 F.3d 1021, 1028 (8th Cir.1996) ("[W]e hold that [the plaintiff's] constitutionally-protected interest in freedom from bodily restraint in the context of her public school education must be evaluated under the standard adopted in *Youngberg* ...."). Thus, the court must determine whether the defendants have provided M.H. freedom from undue restraint "by ascertaining whether 'professional judgment was in fact exercised.'" *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (2d Cir.1984) (quoting *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

In this case, the parties do not dispute that M.H. was subjected to both physical and mechanical restraints. What the parties do dispute is whether the defendants who employed such restraints exercised professional judgment in doing so. The defendants argue that M.H.'s IEP did not specifically prohibit all physical restraint and that "it was the understanding of all involved that such physical restraint would be required at times."

The affidavits of the defendants, Bourgault, Wininger, Marchesi and Palangi, all describe the "behavior management plan" that was in place for M.H. during the times relevant here, which included "physical management techniques." The defendants apparently derived these "prescribed physical management techniques" from the 1993 CREC report, a portion of which states:

the particular decision at issue." *Youngberg v. Romeo,* 457 U.S. 307, 323, n. 30, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

---

**9.** The Court defined a "'professional' decisionmaker" as a "person competent, whether by education, training or experience, to make

All staff working with [M.H.] should receive Physical Management training and frequent refresher courses. It is important that staff feel comfortable and confident when using any form of physical management. Familiarity with these techniques will create a 'safe' learning environment and will reduce injury to staff and students. It is recommended that the staff become familiar with...

1) Non-verbal communications (non-threatening posture, approach and style)
2) Defense zonesphysical safety
3) Grabs release (scratch avoidance)
4) Hair pull release
5) Escorts/ Transports
6) Chair restraint (wrap)

Thus, while there is some evidence that the use of some type of restraint was necessary for M.H., the court concludes that there are material facts in dispute as to whether professional judgment was exercised in the development, maintenance, and implementation of this behavior plan. Drawing all inferences in favor of the non-moving plaintiff, the court is unable to "make certain that professional judgment was in fact exercised," *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (quoting 644 F.2d 147, 178 (3d Cir.1980) (Seitz, J., concurring)), to conclude that the defendants are entitled to judgment as a matter of law.

Specifically, the court is without facts concerning the circumstances of when physical and mechanical restraint were necessary for the safety of M.H. or others, whether each of the individual defendants followed the prescribed rules for using restraints, and whether the defendants received adequate training to use such restraints in an appropriate manner. In addition, the defendants have not provided the court with sufficient information about the individual defendants' levels of expertise and experience for the court to conclude that they were each "competent, whether by education, training, or experience, to make the particular decision [regarding M.H.]." *Youngberg v. Romeo*, 457 U.S. 307, 323, n. 30, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

The defendants' motion for summary judgment is therefore denied with respect to the plaintiff's substantive due process cause of action.

## C. PROCEDURAL DUE PROCESS

The defendants next argue that they are entitled to summary judgment on counts three and four of the complaint which allege that they deprived the plaintiff of his procedural due process rights. Specifically, the defendants argue that "[t]he record in this case amply documents that M.H.'s parents at all times were aware of, and freely exercised, their due process rights with respect to his education." The defendants argue that the M.H.'s parents requested and received a due process hearing to determine whether M.H. was receiving a free appropriate public education, and have thus received all the due process available to them.

In response, the plaintiff argues that the defendants deprived M.H. of his interest in a free appropriate public education, without the due process of law. Specifically, the plaintiff argues that the behavior plan implemented by the defendants lacked parental consent and was not properly documented. In addition, the plaintiff argues that "fundamental changes in plaintiff's program changes involving the use of aversive techniques were implemented without changes to an IEP, notice to the parents, or a PPT."

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due

Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). In *Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987), the second circuit concluded that parents may bring a § 1983 cause of action "based on alleged violations of the EHA [the predecessor to the IDEA] or the Due Process and Equal Protection clauses of the federal Constitution." Here, the plaintiff has alleged that the defendants deprived him of liberty and property interests, based upon M.H.'s "enforceable substantive right" to a free appropriate public education. *Id.* at 751; *see also "BD" v. DeBuono,* 130 F.Supp.2d 401, 431 (S.D.N.Y.2000).

■ The Supreme Court has identified two types of procedural due process challenges: first, a challenge based on a state's regulations or procedures; and second, a challenge based on unauthorized, random acts of state employees. *See Hudson v. Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In cases where a plaintiff challenges the random acts of state employees, as is the case here, "the Due Process Clause of the Fourteenth Amendment is not violated ... so long as the State provides a meaningful postdeprivation remedy." *Hellenic Amer. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996). When a deprivation occurs because of the random acts of state employees, and not because of an official state procedure, it is nearly impossible for the state to foresee such an event in order to provide a meaningful pre-deprivation hearing. *Hellenic Amer. Neighborhood Action Comm. v.*

*City of New York,* 101 F.3d 877, 880 (2d Cir.1996).

■ "Because the State cannot remedy a violation of the IDEA until it occurs, this was an instance where a post-deprivation remedy is the only one 'which the State could reasonably be expected to provide.'" *"BD" v. DeBuono,* 130 F.Supp.2d 401, 434 (S.D.N.Y.2000) (quoting *Simmons v. Chemung County Dep't of Soc. Servs.,* 770 F.Supp. 795, 799 (W.D.N.Y.1991)). Here, the plaintiff has not alleged that he was deprived of his interests pursuant to a state procedure or regulation, but rather has alleged that the acts of the individual defendants, in violation of established law, deprived him of his interests. The plaintiff was thus entitled to some type of post-deprivation procedure. The plaintiff was afforded this post-deprivation remedy in the form of the two administrative appeals, brought pursuant to 20 U.S.C. § 1415 and Conn. Gen.Stat. § 10–76h. The plaintiff has not alleged that either of these appeals were procedurally defective. The court therefore concludes that the defendants afforded the plaintiff all the process that was due to him under the Due Process Clause. *See Wenger v. Canastota Cent. Sch. Dist.,* 979 F.Supp. 147, 153 (N.D.N.Y. 1997) (concluding that the plaintiffs, who requested and received an impartial hearing, were provided with an adequate post-deprivation remedy for alleged violations of the IDEA); *see also "BD" v. DeBuono,* 130 F.Supp.2d 401, 435 (S.D.N.Y.2000) (holding that IDEA administrative procedures provided an adequate post deprivation remedy).

Based on the above, the court concludes that the board of education and the individual defendants are entitled to summary judgment for the plaintiff's procedural due process causes of action.

## D. BOARD OF EDUCATION MUNICIPALITY LIABILITY

■ The defendant, the Bristol board of education, next argues that it is entitled to summary judgment on count one of the complaint because the plaintiff has not alleged facts to show that the municipality is liable for the alleged wrongdoings of its employees. In response, the plaintiff argues that "the municipal custom of restraining plaintiff, without a behavior plan, without any documentation, was, in itself, illegal."

In *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court concluded that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. The Court, however, concluded that a municipality may be sued under § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018. Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292 (1986).

A plaintiff who seeks to impose liability on a municipality under § 1983 must identify a "municipality 'policy' or 'custom' that caused the plaintiff's injury." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382 (1997). A plaintiff may do this by presenting evidence of:

(1) a formal policy which is officially endorsed by the municipality, *see Monell*, 436 U.S. at 690[, 98 S.Ct. 2018]; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the [plaintiff's] civil rights, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive notice knowledge of policy-making officials, *see Monell* at 690–91[, 98 S.Ct. 2018]; or (4) a failure by official policy makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact, *see City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

*"BD" v. DeBuono*, 130 F.Supp.2d 401, 438 (S.D.N.Y.2000).

Here, the plaintiff has not alleged that the board of education endorsed a formal policy or maintained a custom of physically restraining handicapped children in its charge or depriving handicapped children of their rights under the IDEA. *See "BD" v. DeBuono*, 130 F.Supp.2d 401, 438 (S.D.N.Y.2000) (finding a genuine issue of fact existed for purposes of determining municipality liability where the plaintiffs alleged that the defendant county had a policy of limiting certain therapies to children with autism).[10] Instead, the plaintiff argues that his complaint "alleges that a policy existed under which the plaintiff was subject to physical and mechanical restraint, as well as other aversive ac-

---

**10.** Moreover, the plaintiff has not alleged that the board of education's inadequate training of the individual defendants was the " 'moving force' behind the plaintiff's injury." *See*

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407–08, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

tions[,]" and that such a policy "is shown by the acts of those in the school system whose acts can fairly be said to represent official policy."

"That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation . . . ." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 406, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In order to show that an official whose actions represent official policy caused the actions complained of, "the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000) *cert. denied*, 531 U.S. 813, 121 S.Ct. 47, 148 L.Ed.2d 16 (2000). Such a determination is a legal question and must be analyzed on the basis of state law. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000). Here, the plaintiff has not alleged that any of the individual defendants who restrained M.H. or who violated his rights under the IDEA possessed "final policymaking authority" for the court to conclude that such defendant's actions can be properly attributable to the board of education itself. Specifically, the plaintiff has not demonstrated that any of the individual defendants were "final policymaker[s]" under Connecticut law or that their actions represented the official policy of the board of education with respect to M.H.'s education. *See Anthony v. City of New York*, No. 00Civ.4688(DLC), 2001 WL 741743, at *8 (July 2, 2001) (rejecting plaintiffs' argument that a police officer possessed final policymaking authority where "[p]laintiffs have put forth no basis to conclude that a Sergeant's actions can represent official policy").

The court concludes that the plaintiff has not alleged sufficient facts to show that the board of education is liable for the alleged wrongdoings of the individual defendants. The board of education's motion for summary judgment is therefore granted.

## E. SUPERVISORS' LIABILITY

 The individual defendants, Bourgault, Ives, Maher, and Wasta, next argue that they are entitled to judgment as a matter of law in counts two, three and four of the complaint because there is no basis for their supervisory liability under § 1983. Specifically, the defendants argue that "[n]one of the four standards for supervisory liability can be met here . . . ." In response, the plaintiff argues that "[a]t this point, plaintiff cannot say which of the four types of personal involvement . . . may be applicable to each of the four supervisory defendants," but that there are "sufficient allegations to conclude, through reasonable inference, that such personal involvement was present."

"[P]ersonal involvement of defendants in alleged [unlawful] deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). In *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir.1999), the second circuit concluded: "Supervisors may be found liable under Section 1983 for their own actions, but also, in certain circumstances, for the actions of the subordinates." Supervisors may be liable for the deprivation of a plaintiff's rights if:

(1) the [supervisory official] participated directly in the alleged [unlawful] violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which [unlawful] practices occurred, or allowed the continuance of such policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrong-

ful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that [unlawful] acts were occurring. *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)).

Counts two, three and four of the amended complaint allege that the supervisory defendants violated M.H.'s substantive due process rights and IDEA procedural rights by using "mechanical restraint and other aversive techniques." The plaintiff concedes that he "cannot state, with certainty," which of the above scenarios occurred, but argues: "What is clear from the allegations of the Amended Complaint is that the supervisory defendants knew of the aversive practices, had the ability to remedy the problem, either through halting the practices or convening a PPT to adopt a behavior management plan, yet they did nothing."

The affidavits of the defendants, Maher, Wasta and Ives, make clear that these defendants each learned of the spitting incident on May 10, 1996, and took prompt action to address Palangi's actions. There is no evidence that these supervisors had any previous knowledge of similar incidents. Nor is there any evidence that any of these defendants were personally involved in developing M.H.'s behavior management plan, in planning his IEPs, or in mechanically or physically restraining M.H. The plaintiff's assertions, without any documentary evidence, that these defendants knew of the unauthorized aversive techniques and failed to remedy the situation, are insufficient to show that the personal involvement of the defendants, Maher, Wasta or Ives in the alleged unlawful deprivations, which "is a prerequisite to an award of damages under

§ 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). Accordingly, these defendants are entitled to judgement as a matter of law.

The affidavit of the defendant, Bourgault, demonstrates that she was familiar with M.H.'s IEP as well as the behavior management plan in place for M.H. based on the 1993 CREC report. Bourgault was in a position to know that the behavior plan for M.H. which was used by his teachers was not formally included in his IEP or consented to by Mr. and Mrs. H. Bourgault thus knew of the alleged IDEA procedural violation and the substantive due process violation and did nothing to remedy these wrongs. The court concludes that she is not entitled to judgment as a matter of law.

The motion for summary judgment is, therefore, granted as to the defendants, Maher, Wasta and Ives, and is denied as to the defendant, Bourgault.

## F. QUALIFIED IMMUNITY

The defendants, Bourgault, Wininger, Marchesi and Palangi finally argue that they are entitled to qualified immunity for their actions because their actions did not constitute a knowing violation of federal law and were objectively reasonable. In response, the plaintiff argues that the individual defendants are not entitled to qualified immunity because their obligations under the IDEA were clear, and that the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), makes clear the law regarding unconstitutional restraint.

Government officials performing discretionary functions are provided with qualified immunity to "shield[ ] them from civil damages liability as long as their actions could reasonably have been thought con-

sistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Whether a defendant is entitled to a defense of qualified immunity "turns on the 'objective reasonableness' of the actions, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* at 639, 107 S.Ct. 3034 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

The second circuit has concluded that in making the determination of whether a right is "clearly established," a court must consider: "(1) whether the right in question was defined with 'reasonable specificity;' (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). "[T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 251 (2d Cir.2001).

With respect to the plaintiff's causes of action for violations of the IDEA, the court concludes that the individual defendants are not entitled to qualified immunity because the law was clearly established that each child's individualized education plan be developed and revised at least annually, by a team composed of the parents of the child with a disability. 20 U.S.C. § 1414(d). *See Butler v. South Glens Falls Cent. Sch. Dist.,* 106 F.Supp.2d 414, 421–22 (N.D.N.Y.2000) (holding that the defendants were not entitled to qualified immunity where it was not objectively reasonable for them to believe that "failing to develop IEP's which contained the required information" did not violate the plaintiff's statutory rights).

With respect to the plaintiff's cause of action for violation of M.H.'s substantive due process rights, the court concludes that the individual defendants are not entitled to qualified immunity at this time because, as discussed above, it is uncertain whether they exercised professional judgment when restraining M.H.

The court therefore concluded that the individual defendants are not entitled to qualified immunity for their actions at this time.

## II. STATE LAW CAUSES OF ACTION—SOVEREIGN IMMUNITY

In addition to their federal causes of action, the plaintiff brings state common law causes of action against the defendants, Wininger and Palangi, for assault and intentional infliction of emotional distress, and the common law tort of negligence against the defendants, Wininger, Palangi and Marchesi.

The individual defendants first argue that they are not liable for the alleged torts committed upon the plaintiff, M.H., based upon the doctrine of sovereign immunity. Specifically, the defendants argue that because the board of education and its agents "were engaged in providing special education services to M.H., an activity of the State, the protections of sovereign immunity are triggered and there can be no liability of the defendants for any alleged assault, intentional infliction of emotional distress or negligence." In response, the plaintiff argues that these individual defendants are being sued in their individual

capacities, and sovereign immunity does therefore not apply.

▆▆▆▆▆ In Connecticut, the protection of sovereign immunity in tort actions "has been extended to agents of the state acting on its behalf." *Cahill v. Board of Education of City of Stamford*, 187 Conn. 94, 101, 444 A.2d 907 (1982). A local board of education, as an agent of a town, is subject to the laws governing municipalities, *see id.*, and can thus be an agent of the state for purposes of sovereign immunity. In *Purzycki v. Town of Fairfield*, 244 Conn. 101, 112, 708 A.2d 937 (1998), the Connecticut supreme court explained that "our jurisprudence has created a dichotomy in which local boards of education are agents of the state for some purposes and agents of the municipality for others."

▆▆▆▆ "[T]he furnishing of an education for the public is a state function and duty ... placed upon the state by article eighth, § 1 of the state constitution ...." [11] *Town of Cheshire v. McKenney*, 182 Conn. 253, 257–58, 438 A.2d 88 (1980). Because state statutes delegate to local school boards the responsibilities of providing educational services, "[t]here is no question but that local boards of education acts as agencies of the state when they are fulfilling the statutory duties imposed upon them pursuant to the constitutional mandate of article eighth, § 1." *Id.* at 258, 438 A.2d 88.

The court concludes that the torts allegedly committed by the defendants—assault, infliction of emotional distress and negligence—stem from the defendants providing special education services pursuant to a delegated state responsibility. The defendants are therefore entitled to sovereign immunity from liability on counts five, six and seven of the complaint. *See Todd M. v. Richard L.*, 44 Conn.Supp. 527, 539–40, 696 A.2d 1063 (Conn.Super.Ct. July 14, 1995) (holding that the doctrine of sovereign immunity applies to defendants who were providing transportation services to a disabled child as part of the child's IEP); *see also Milhomme v. Levola*, No. CV940048326S, 1995 WL 441685, at *6–7 (Conn.Super.Ct. July 14, 1995) ("Since the provision of special education services ... is carried out by a board of education pursuant to a specific educational mandate of the state the doctrine of sovereign immunity applies ...."); *Crandall v. Groton Bd. of Educ.*, No. 102935, 1993 WL 499080, at *2–3 (Conn.Super.Ct. Nov. 26,1993) (concluding that "[i]n developing and maintaining a special education program, a board of education acts under state mandate," and therefore, the doctrine of sovereign immunity applies).[12]

The court concludes, therefore, that the defendants, Wininger, Marchesi and Palangi, are entitled to sovereign immunity from liability on counts five, six and seven of the complaint.

11. Article eighth, § 1 of the Connecticut constitution states: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

12. The plaintiff argues that, under Connecticut law, sovereign immunity is not available to municipal defendants sued in their individual capacities. However, when a plaintiff "makes no claim ... that any of the defendant officers sued in their individual capaci-

ties acted pursuant to an unconstitutional enactment or in excess of statutory authority[,] ... sovereign immunity requires dismissal [of those portions of the complaint seeking damages.]" *Fetterman v. Univ. of Connecticut*, 192 Conn. 539, 552–53, 473 A.2d 1176 (1984); *see also Horton v. Meskill*, 172 Conn. 615, 624, 376 A.2d 359 (1977)(concluding that, in Connecticut, the doctrine of sovereign immunity does not apply to a defendant who is acting under an unconstitutional statute or in excess of his or her statutory authority).

## CONCLUSION

For the reasons stated herein, the defendants' motion for summary judgment (documents no. 58, 71) is GRANTED IN PART and DENIED IN PART. The motion is granted as to the defendants the board of education, Maher, Wasta and Ives; as to all the defendants with respect to the plaintiff's causes of action based on procedural due process violations (counts one and three); and as to the defendants in counts five, six and seven of the complaint. The motion is denied in all other respects.