A.A., et al., Plaintiffs,

v.

BOARD OF EDUCATION, CENTRAL ISLIP UNION FREE SCHOOL DISTRICT, et al., Defendant.

No. CV96–4966.

United States District Court, E.D. New York.

April 7, 2003.

Wasserman & Steen, By Lewis M. Wasserman, Patchogue, NY, for Plaintiff.

Eliot Spitzer, Attorney General, By Susan M. Connolly, Assistant Attorney General, New York State Department of Law, Hauppauge, NY, for New York State Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

This action was commenced on behalf of a group of former and current students in the Central Islip Union Free School District. Originally named as Defendants were the School District, the State Education Department for the State of New York, Richard P. Mills, the New York State Commissioner of Education ("Commissioner Mills") and George E. Pataki, the Governor of the State of New York ("Governor Pataki"). Plaintiffs' settlement of their claims against the District left remaining as defendants the State of New York, Commissioner Mills and Governor Pataki (collectively the "State Defendants").

Prior to trial, the State Defendants moved to dismiss the complaint. The court's disposition of that motion dismissed all claims for money damages but allowed Plaintiffs to pursue claims for prospective injunctive relief, including claims for compensatory education. A non-jury trial of Plaintiffs' claims was held before this court between December 5 and December 19, 2003. The parties have submitted proposed findings of fact, conclusions of law and legal memoranda. The court has considered those submissions and this constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. The Parties

1. Plaintiffs are a certified class of all students with disabilities, or thought of as having disabilities, born after December 31, 1975 and before January 1, 1990, who reside in the Central Islip School District and were classified as students with disabilities by the district Committee on Special Education ("CSE") as of October 9, 1996.

2. The New York State Education Department ("SED") is the State Educational Agency for the State of New York, within the meaning of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400–1487 ("IDEA").

3. Richard P. Mills is the Commissioner of the New York State Department of Education ("Mills" or the "Commissioner")

4. George E. Pataki is the Governor of the State of New York.

### B. The School District

5. Central Islip Union Free School District (the "District") is a school district within the State of New York, County of Suffolk.

6. The District has been identified by the State Education Department as a "high need" school district, i.e., it is a district that has a low socioeconomic character and low wealth in comparison with other school districts in New York State and on Long Island.

7. The identification of the District as "high need" also refers to the fact that the District is in a high need of resources without a corresponding availability of resources through taxes.

### C. The Monitoring of the District by SED and the District's Compliance with the IDEA

8. SED monitors the use of federal special education funds by all school districts within the State of New York. Due to the great number of school districts within the State, SED cannot visit and conduct intensive reviews of every school district on an annual basis. In an effort to effectively monitor school district performance, SED currently employs a system of reviewing "key performance indicators." Such indicators include, for example, review of standardized test scores. The re-

view of key performance indicators allows SED to focus its efforts on low performing school districts.

9. The State's methods of monitoring school districts has evolved over time. Prior to instituting the key performance indicator method of review, SED visited school districts on a rotating basis, with comprehensive visits being made once every seven years. This cycle of review was not instituted pursuant to any specific federal regulation and there is no indication that this cycle was in any way contrary to law. Instead, it was the method of review chosen by the State of New York, as well as other states, to fulfill its monitoring responsibilities at the time.

10. In 1990, SED undertook a comprehensive review of the special education program in the District. The review was conducted as part of the State's then-periodic intensive review of New York school districts.

11. The 1990 review culminated in a July 1991 thirty-three page report entitled "Special Education Report of the Central Islip Union Free School District" (the "1991 Report").

12. As of the date of the 1991 Report, the District had a total population of 5,962 children. Of these, 13.9% were classified as handicapped and 196 children were classified as Limited English Proficient. The District had 36 self-contained special education classrooms as well as resource rooms in each of the District's school buildings.

13. The 1991 Report identified areas of strengths and weaknesses in the District. Among the strengths recognized was the access to the full scope of regular education curriculum to all students in the special education department as well as compliance in the composition of the Committee on Special Education and all notices of that committee. The District was complimented on the quality of speech and language evaluations as well as its implementation of a work study program.

14. The 1991 Report also identified several areas in which the District was not in compliance with law. Those areas were set forth in detail. For each area of noncompliance, the 1991 Report set forth the specific corrective action and documentation necessary to bring the District into compliance. Also listed in the 1991 Report was the date by which compliance was to be achieved. The latest full compliance date set forth in the 1991 Report was September of 1991.

15. The issues facing the District's special education program were typical of issues facing similarly situated school districts in the State. School districts experiencing such similar problems are those districts facing issues such as poverty, homelessness, a transient population and children in foster care. Each of these socioeconomic facts have a negative impact on both general and special education programs and outcomes. These factors also make it difficult to achieve swift compliance with legal requirements.

16. SED delegated to its local representatives the responsibility of working with and monitoring the progress of the District in terms of its compliance with the goals set forth in the 1991 Report. These local authorities consist of SED's regional Long Island office and its regional associates.

17. SED employs seven regional associates in its Long Island office. These regional associates are responsible for overseeing approximately 125 school districts. Within these districts, the regional associates work with public schools, BOCES programs, private schools, preschools as well as with students with disabilities.

18. The SED regional associate primarily responsible for monitoring the District's compliance with relevant education laws was Bruce Schacter, SED's regional associate responsible for the region that includes the District. Schacter testified extensively at trial.

19. Schacter's testimony and the documentary evidence adduced at trial demonstrated that Schacter dealt directly with the District on numerous occasions. In addition to monitoring the District's progress with respect to the 1991 Report, Schacter handled parent complaints and offered technical assistance to the District on a variety of special education issues.

20. When Schacter had difficulty obtaining District compliance with the IDEA goals set forth in the 1991 Report, he involved his superiors at SED. Those superiors included Steven Berman, Schacter's Regional Supervisor, and Rebecca Cort, the Statewide Coordinator for Special Education. Both Berman and Cort testified at trial.

21. SED made great efforts and worked with District representatives to attempt to meet the goals set forth in the 1991 Report.

22. Among the assistance rendered to the District by SED was technical assistance, assistance with training, review of programs, direct response and follow-up to parent complaints, development of a District special education handbook and review of regularly submitted District records.

23. To increase the pressure to meet compliance objectives, SED representatives continually moved up the chain of command when working with the District to help the District to achieve compliance with special education laws. Thus, initial negotiations took place between the SED regional associate and the District Director of Special Education. Thereafter, higher level negotiations took place involving higher SED officials and the District Board of Education. During these negotiations, the District was advised of the consequences of continuing non-compliance. It was pointed out that such consequences could include withholding, delaying or redirecting federal special education funds as well as the possibility of the complete loss of such funds to the District.

24. Between the years 1991 and 1999, special education statutes and regulations changed. Accordingly, over time, certain of the actions required by the 1991 report became obsolete.

25. A 1999 Special Education Program Review Report of the Central Islip Union Free School District (the "1999 Report") details the District's compliance with the goals set forth in the 1991 Report.

26. Despite the fact that SED requested and expected compliance with the goals set forth in the 1991 Report by September of 1991, the 1999 Report reveals that compliance was not achieved until several years later. Partial compliance with SED goals was achieved in 1997 and full compliance was achieved in June of 1999. This full compliance refers only to the issues set forth in the 1991 Report that remained relevant under the law in effect in 1999.

27. During the course of their monitoring and working with District teachers and administrators, Schacter and other SED officials were aware that SED had the power to refuse to release special education funds to the District.

28. In addition to imposing sanctions related to federal funding, a final and drastic step that SED can take with respect to a non-compliant school district is to act to remove that district's Board of Education and replace that board with state control of the district. This is a step that has been taken on only one occasion in the

state of New York, and that occasion did not involve the District.

29. Despite its knowledge that it could replace the District School Board and/or cut off completely the District's federal funds, SED declined to take such measures. Instead, the most drastic step taken by SED with respect to the District came in 1997 when the decision was made to withhold certain discretionary federal funding. Thus, in 1997, SED advised the District that federal funds would be withheld unless progress was made. Such funds were delayed until the District showed compliance with target areas. Although Schacter advised the District that continuing non-compliance with law could jeopardize funding, neither he nor his superiors at SED ever acted to cut off completely the flow of federal funds.

30. Schacter and other SED officials were aware that refusing to release federal funds to the District would have been a drastic step that would not necessarily achieve the goal of assuring compliance with all requirements of law.

31. Refusing to release federal funds to the District would have been harmful to the children served by the District.

32. SED did not move to the sanction of withholding federal funds from the District because of its belief that the District was making a good faith effort to move toward compliance with applicable education laws.

33. The evidence at trial failed to show that cutting off the District's special education funds would have had any positive effect on the quality of special education services afforded to children in the District. Although the State could have cut off the funds and acted to use those funds to directly provide special education services, such action would, as a practical matter, have had little or no immediate effect. This is because even though the State would have used the same funds to provide services, the State would have been faced with the same issues faced by the District.

34. Had the State acted to directly provide special education services, they would have used the same facilities and the same personnel. Additionally, they would have had to deal with the same teachers' union as well as the same Board of Education.

## CONCLUSIONS OF LAW

A. *Plaintiffs' Allegations and Relief Sought*

1. Plaintiffs' claims against the State Defendants allege that the IDEA was violated because these Defendants failed to fulfill their statutory obligations to monitor and ensure IDEA compliance by the School District.

2. The Complaint seeks a declaration that the State Defendants have failed to ensure that the School District complied with the IDEA, the Rehabilitation Act and the New York State Education Law. In addition to alleging violation of these statutes, Plaintiffs seek to enforce compliance with the federal statutes by way of an action pursuant to Section 1983.

3. Plaintiffs' Rehabilitation Act cause of action alleges discrimination in the administration of education funds on the basis of disability.

4. Plaintiffs seek prospective injunctive relief requiring that compensatory education be provided to class members. While Plaintiffs have not clearly set forth the particular relief sought for each class member, the relief sought includes the establishment of reading and vocational training programs for the class members.

B. *Relevant Statutory Framework*

5. The IDEA creates a private right of action to enforce every child's right to a

"free appropriate public education." 20 U.S.C. § 1415(i)(2)-(3). This is defined to include special education and related services tailored to the needs of individual children. *See Board of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir.2000).

■ 6. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") prohibits federally funded state and local agencies from discriminating against students with disabilities. *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir.2000); *M.B. v. Arlington Cent. Sch. Dist.*, 2002 WL 389151 *2 (S.D.N.Y. March 12, 2002). If handicapped students are provided with reasonable accommodations, the requirements of Section 504 are satisfied. *M.B. v. Arlington Cent. Sch. Dist.*, 2002 WL 389151 *2 (S.D.N.Y. March 12, 2002).

■ 7. A plaintiff may enforce the rights granted by the IDEA by way of an action brought pursuant to Section 1983 *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987); *M.H. v. Bristol Bd. of Educ.*, 169 F.Supp.2d 21, 29 (D.Conn.2001); *Butler v. South Glens Falls Cent. Sch. Dist.*, 106 F.Supp.2d 414, 420 (N.D.N.Y.2000); *see Polera v. Board of Educ.*, 288 F.3d 478, 483 n. 5 (2d Cir.2002). Likewise, rights alleged pursuant to Section 504 may also be pursued by way of a Section 1983 cause of action. *Weixel v. Board of Educ. of the City of New York*, 287 F.3d 138, 151 (2d Cir.2002) (Section 1983 claim can be pursued where plaintiff stated a claim pursuant to Section 504, the ADA and the IDEA).

8. The court has jurisdiction over Plaintiff's IDEA, Section 504 and Section 1983 claims.

9. Among the goals of the Individuals with Disabilities in Education Act, 20 U.S.C. §§ 1400–1485 (the "IDEA") is the goal of ensuring that all children with disabilities have available to them a free appropriate public education emphasizing special education and related services designed to meet individual needs and preparing children for employment and independent living. 20 U.S.C. § 1400(d)(1)(A).

10. An additional purpose of the IDEA is to "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(4).

11. The IDEA puts federal, state and local governments and agencies in partnership to ensure that the goals of the IDEA are met. *See* 20 U.S.C. § 1400(1)(B)and(C).

12. Under the IDEA, the federal government makes grants of money to States to assist them in providing special education and related services to children with disabilities. 20 U.S.C. § 1411(a)(1).

13. The IDEA defines a "State Educational Agency" ("SEA") as the State board of education or any agency that is primarily responsible for the State supervision of public schools. 20 U.S.C. § 1401(28). The Defendant SED is an SEA within the meaning of the IDEA.

14. The IDEA defines a Local Educational Agency ("LEA") as a public board of education or other public authority legally constituted within a state for control or direction of a school district. The District is an LEA within the meaning of the IDEA. *See* 20 U.S.C. § 1401(15)(A).

15. The IDEA places certain responsibilities on SEA's and LEA's

16. Under the IDEA, SED is required to exercise general supervisory responsibilities to ensure proper administration of the statute. 20 U.S.C. § 1412(11)(A).

17. Specifically, SED is responsible for ensuring that: "(I) the requirements of [the IDEA] are met; and (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State of local

agency (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and (II) meet the educational standards of the SED." 20 U.S.C. § 1412(a)(11)(A).

18. Local educational agencies become eligible to receive IDEA funds if they demonstrate, to the satisfaction of the SEA, the existence of policies and procedures consistent with State-established IDEA policies and procedures. 20 U.S.C. § 1413(a)(1)

19. The SED is empowered to determine whether or not an LEA is eligible to receive IDEA funds. The statute provides, however, that an SEA can make no determination depriving an LEA of IDEA funds without first affording the LEA reasonable notice and an opportunity for a hearing. 20 U.S.C. § 1412(a)(13); *see also* 20 U.S.C. § 1413(c). The notice required must include a public notice sufficient to bring the pendency of such an action to the attention of the public within the jurisdiction of the LEA. 20 U.S.C. § 1413(d)(2).

20. If, after reasonable notice and an opportunity for a hearing, the SEA determines that the LEA cannot comply with State IDEA policies and procedures, the statute provides that the SEA "shall reduce or may not provide" IDEA funds to the LEA until the SEA is satisfied that the LEA is complying with IDEA policies and procedures. 20 U.S.C. § 1413(d); *see* 34 C.F.R. § 300.197(a).

21. The IDEA empowers the SEA to use IDEA funds to directly provide special education services to children in a school district. The direct use of IDEA funds by the SEA is authorized where a district fails to provide information necessary to establish eligibility to receive IDEA funds and/or when the district is "unable to establish and maintain programs of free appropriate public education that meet the requirements of" the IDEA. 20 U.S.C. § 1413(h)(1)(A) and (B).

22. While the IDEA clearly places a supervisory and monitoring role on the SEA, the specific requirements of that role (with the exception of requiring the formulation of policies and procedures), are not set forth in the statute. Instead, the SEA has discretion to work with the LEA to ensure compliance with the IDEA.

23. Fulfillment of the SEA's statutory obligation includes assisting school districts in their compliance efforts by working together with district personnel to bring the district into IDEA compliance. State Educational Agencies can further compliance goals by providing technical assistance. Such assistance includes making education professionals aware of applicable provisions in the law and any changes thereto. Technical assistance also includes providing school districts with models about appropriate practices. State educational authorities also further compliance with the law by providing assistance with training, responding to parent complaints and delaying or redirecting state funds.

24. In 1999, the Department of Education ("DOE" or the "Department") issued new regulations implementing changes made in 1997 to the IDEA. *See* Department of Education Rules and Regulations, reprinted at, 64 FR 12406. These regulations shed light on the Department's policy regarding the states' role in enforcing IDEA compliance by school districts.

25. Specifically, when the DOE was considering new regulations, one commenter suggested that States be required to verify that corrective actions have been taken by school districts within a certain set period of time. The Department recognized the importance of a strong state monitoring system and the general supervisory responsibilities of the SEA. Nonetheless, the Department chose

to emphasize the importance of the technical assistance to be provided by the SEA over SEA enforcement responsibilities.

26. Thus, the DOE rejected the notion that further regulation enforcing strict compliance dates was necessary. Refusing to take such action, the Department of Education noted that "there is a great variety of circumstances that may give rise to compliance problems, and States should have some flexibility in fashioning remedies and timelines for correction." 64 FR 12406, 12464–65.

**B. *SED Did Not Violate the IDEA or the Rehabilitation Act***

27. Plaintiffs interpret the IDEA as requiring that the SEA act to remove IDEA funds whenever a school district is found to be out of full compliance with IDEA policies and procedures.

28. Plaintiffs' interpretation of the statute has support in neither the statute's purpose nor common sense. Contrary to Plaintiffs' position, the statute's purpose is furthered by a more flexible approach. Thus, rather than requiring removal of state funds, it furthers the mandates of the IDEA, and is in the best interests of school children, to allow flexibility in the SEAs' attempts to monitor and obtain compliance with the IDEA.

29. Plaintiffs' interpret the IDEA to require the State Defendants to have cut-off federal special education funds to the District. According to Plaintiff, such action would have resulted in IDEA compliance and better delivery of special education services to the children in the District.

30. Plaintiffs' failed to demonstrate at trial how the cut off of funds by the State Education Department would have furthered the purpose of the IDEA or the educational needs of the children in the District.

31. The evidence at trial failed to show how the State could have directly handled the special education issues facing the District in any way that would have benefitted the Plaintiff class.

32. Plaintiffs also advanced the theory that the cut-off of funds would have resulted in sending a message to the community that the Central Islip Board of Education was ineffectual. This message would, in turn, have resulted in the election of a new school board which would have been better equipped to deliver services to children in the Plaintiff class.

33. Plaintiffs failed to prove that their theory regarding the replacement of the existing District Board of Education was anything more than speculation. There was no evidence produced at trial and no reason to believe that a newly elected Board of Education, elected by the same citizens, would have been any more effectual than the Board of Education in control of the District during the relevant time period.

34. While the evidence at trial tended to show that the District was slow to comply fully with the requirements of the IDEA, the evidence did not show that the delay in reaching compliance was attributable to the failure of SED to fulfill its supervisory and monitoring responsibilities.

35. The evidence at trial did not prove that SED violated the IDEA by failing to carry out the statutory mandate of supervising and monitoring the District's IDEA compliance. To the contrary, the evidence at trial showed that the SED worked with the District in order to obtain IDEA compliance and deliver appropriate services to the children in the District.

36. Plaintiffs failed to show that the cutting off of Federal special education

funds was required for the State to fulfill its statutory monitoring responsibilities.

37. The conduct of the SED in relation to the District was in full compliance with the flexible IDEA supervisory and monitoring functions of state educational agencies.

38. Plaintiffs failed to show at trial any discriminatory practice in violation of Section 504 of the Rehabilitation Act.

## CONCLUSION

1. Plaintiffs' claims pursuant to the IDEA, Section 504 of the Rehabilitation Act and Section 1983 are hereby dismissed. Plaintiffs have not submitted legal memoranda nor in any way attempted to support a State law claim and any such claims are therefore similarly dismissed.

2. The Clerk of the Court is directed to enter judgment in favor of the State Education Department of the State of New York, Richard P. Mills and George E. Pataki.

3. In view of the fact that Plaintiffs have previously settled their claims against all other defendants, the Clerk of the Court is further directed to terminate any outstanding motions and to close the file in this case.

SO ORDERED.