**Ibrahim ZAHRAN, a disabled student, by his parent, Ahmed ZAHRAN, Plaintiffs,**

v.

**State of NEW YORK DEPARTMENT OF EDUCATION; and The Board of Education of the Niskayuna Central School District, Defendants.**

No. 1:03–CV–615.

United States District Court, N.D. New York.

Feb. 10, 2004.

Nolan & Heller, LLP, Albany, NY, Robert G. Wakeman, of Counsel, for Plaintiffs.

Hon. Eliot Spitzer, Attorney General of the State of New York, Albany, NY, Karen Marcoux Mankes, of Counsel, for Defendant State of New York Department of Education, Office of the Attorney General.

Higgins, Roberts, Beyerl & Coan, P.C., Schenectady, NY, Michael E. Basile, of Counsel, for Defendant Board of Education of the Niskayuna Central School District.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Ahmed Zahran ("plaintiffs"), on behalf of his minor son, Ibrahim Zahran ("Ibrahim" or "plaintiffs"), a disabled student, brought suit against defendants State of New York Department of Education ("DOE") and Board of Education of the Niskayuana Central School District ("Board" or "District"), alleging five causes of action: failure to perform or improper

performance of certain evaluations necessary to develop Ibrahim's individual education plan, resulting in the deprivation of a free and public education, and failure to afford prompt administrative review, all in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, Article 89 of the New York State Education Law, and 42 U.S.C. § 1983 (*first, second,* and *third* causes of action); and discrimination on the basis of disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. (*fourth* and *fifth* causes of action). The District cross-claimed against the DOE, demanding that the DOE state review officer's decision be partially reversed or modified.

The DOE has filed a motion to dismiss the complaint and cross-claim pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6). Plaintiffs and the Board have opposed. The Board did not file a motion to dismiss. Oral argument was heard on November 14, 2003, in Utica, New York. Decision was reserved.

## II.  *FACTUAL BACKGROUND*

Ibrahim is an autistic child with a limited vocabulary and a history of aggressive behavior. After he demonstrated this aggression toward teachers and students in sixth grade at a District middle school, his parents sent him to a private school for children with disabilities. Following the school year, the private school rejected the District's recommendation that Ibrahim stay another year, instead agreeing with his parents' wishes that he return to the District middle school for the 2000–01 academic year. During that year he repeated seventh grade at the middle school. His individual education plan ("IEP") for that year provided that he would: attend a special class with a special education teacher and full-time aide for two hours per day; receive one hour per day of speech therapy; participate in adapted physical education; and be gradually mainstreamed into the regular education classroom in certain subjects. Ibrahim performed well academically, but the District contends that his aggressive behavior resurfaced and intensified during May and June of 2001.

On May 9, 2001, the District's committee on special education ("committee") met to develop Ibrahim's IEP for the 2001–02 academic year. The IEP that the committee developed called for an eighth grade program consisting of: two hours per day of special education instruction with an aide; one hour per day of speech therapy; three 30–minute speech consultations per week; five 30–minute team consultations per week; one 60–minute psychological consultation per month; adapted physical education; lunch with the general student population; and gradual mainstreaming in other areas.

Early in the 2001–02 academic year, Ibrahim's aggressive behavior again resurfaced. It was reported that he struck teachers and aides, and was aggressive toward other students on three separate occasions. The District brought in new staff to work with him, including a special education teacher experienced in dealing with children with autism, and a teacher's assistant trained in crisis and violence intervention and behavior management. Despite the change, Ibrahim's aggression remained. On December 10, 2001, he reportedly punched the middle school principal in the face three times, and struck a teacher in the side three or four times. He was suspended from school that day.

On December 27, 2001, the committee determined that Ibrahim needed an alternative program, and on January 4, 2002, requested an expedited hearing and determination on a proposed Interim Alternative Education Setting ("IAES"), which

would be in effect for 45 days. While the IAES was in effect, the committee, with the help of Ibrahim's parents, would develop a new IEP. Just under a week later, the committee proposed an IAES consisting of: two hours per day of services from a special education teacher and aide at a different District middle school; thirty minutes per day of speech therapy at a different District middle school; consultations by a psychologist and communications specialist with Ibrahim's parents and school staff; a thorough psychological evaluation; and a functional behavioral assessment and development of a behavioral intervention plan.

On January 23, 2002, the District asked DOE'S hearing officer to immediately decide on the propriety of the proposed IAES so that Ibrahim could have some educational program in effect while his new IEP was being developed. Ibrahim's parents objected to the proposed IAES, citing the need for further evaluations.

Just under a week later, on January 29, 2002, the hearing officer issued a ruling. Though he agreed that Ibrahim's current placement at the District middle school was likely to result in injury to him and/or others, he found that the District had not made reasonable efforts to minimize that risk, and that two hours per day of instruction was insufficient. The District and parents were each asked to submit a new proposed IAES by February 15, 2002. In the interim, the hearing officer ordered several evaluations, the development of a behavioral intervention plan by a trained consultant, and a canvassing of District personnel to find replacements for the staff previously working with Ibrahim.

On March 12, 2002, the hearing officer issued his second ruling. He found a proper IAES would consist of three hours per day of special education instruction in Ibrahim's local middle school, in a room near the main office that was modified and equipped for safety as well as instruction. Ibrahim was to be accompanied to the school by an aide in a small van. A planning team was to meet in the future to evaluate the IAES and determine whether the daily hours of instruction could be increased. The hearing officer also ordered the District to begin advertising for a special education teacher who could instruct Ibrahim. The IAES was to commence March 18, 2002.

Ibrahim's parents, however, refused to comply with the IAES because of concerns over the layout of the instruction room and the authorization to physically restrain him if he became violent. On March 27, 2002, after learning of this, the hearing officer visited the instruction room. He found the room to be adequate, but ordered that physical restraint was only to be used as a last resort. He ordered the IAES to be implemented by April 1, 2002.

On April 24, 2002, Ibrahim's parents appealed to the DOE'S state review officer, claiming that Ibrahim should be provided with a full day of instruction in the regular education classroom, and seeking compensatory education for the entire 2001–02 school year plus attorney's fees and costs incurred in locating a proper program for him. The District cross-appealed, stating that the IAES should have been continued for the full 45–day period. A short time thereafter, Ibrahim and his parents moved to Georgia.

On May 7, 2003, nearly eighteen months after Ibrahim was first suspended, the state review officer issued his decision. He determined that the IAES ordered by the hearing officer was adequate, and that the parents' request that Ibrahim be placed in a regular education classroom was inappropriate because he required close monitoring to assure his and others' safety. However, the state review officer also determined that Ibrahim had been

denied a free and public education from December 10, 2001 (the day he was suspended) to April 1, 2002, the equivalent of three months of the three hours per day instruction provided for in the IAES. Because Ibrahim was only fourteen years old at the time of the ruling, however, he determined that it was not a case for compensatory education, instead ordering the District to make up the lost time gradually in future academic years. He also rejected the parents' request for attorney's fees, citing his lack of authority. The District's cross-appeal was granted because of the severity of Ibrahim's problems and the intensive behavioral modification services necessary to return him to his original placement in the middle school.

This suit against the DOE and the Board followed. As noted above, it asserts causes of action pursuant to the Individuals with Disabilities Education Act ("IDEA"), Article 89 of the New York Education Law ("Article 89"), 42 U.S.C. § 1983 ("Section 1983"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act of 1973 ("Rehabilitation Act").

## III. DISCUSSION

### A. Rule 12(b) Standard

The DOE have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6). In deciding a Rule 12(b) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.' " *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995).

However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *See, e.g., Clapp v. Greene*, 743 F.Supp. 273, 276 (S.D.N.Y. 1990); *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir.1988).

### B. Eleventh Amendment Immunity: Article 89, Section 1983, and ADA Claims

The DOE claims that it is immune from suit under Article 89, Section 1983, and ADA. The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "While the Amendment by its terms does not bar suits against a State by its own citizens, [the Supreme] Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

It should be noted here that this immunity from suit does not extend to the Board. Eleventh Amendment protection "shields an entity from suit in federal court only when it is so closely tied to the State as to be a direct means by which the State acts, for instance a state agency. In contrast, when a State creates subdivisions and imbues them with a significant measure of autonomy, ... these subdivisions are considered too separate from the State to be considered its 'arms.' " *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 313, 110 S.Ct. 1868, 109 L.Ed.2d 264

(1990) (Brennan, J., concurring in part and concurring in judgment). "To determine whether a local board of education is an arm of the state and thus entitled to Eleventh Amendment protection from suit in federal court, [a district] court must examine the degree to which the entity is supervised by the state and the entity's source of funds for satisfying judgments rendered against it." *Rosa R. v. Connelly*, 889 F.2d 435, 437 (2d Cir.1989). The Second Circuit has determined that such an entity in New York is not entitled to immunity. *See Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 27 (2d Cir.1986) ("Inferior government bodies do not share in Eleventh Amendment immunity simply because they receive state funds. Moreover, being a steward of educational policy does not make the school district an alter ego of the state"), *overruled on other grounds, Taylor*, 313 F.3d at 786; *see also Gavigan v. Clarkstown Cent. Sch. Dist.*, 84 F.Supp.2d 540, 549 (S.D.N.Y.2000). Thus, the following analysis pertains only to whether the claims discussed therein can be asserted against the DOE.

### 1. Article 89

■ In their *second* cause of action, plaintiffs claim that defendants violated Ibrahim's rights under Article 89 of the New York State Education Law. Ordinarily, because original jurisdiction is properly assumed over some of plaintiffs' claims, this cause of action would remain under 28 U.S.C. § 1367(a)'s grant of supplemental or pendent jurisdiction. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 116, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). However, the Supreme Court has held "that § 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002) (emphasis removed). Therefore, only if Article 89 contains a clear waiver of New York's constitutionally guaranteed immunity from suit will supplemental jurisdiction be proper. No evidence of such waiver has been offered by plaintiffs or otherwise found. *See African Am. Legal Defense Fund, Inc. v. N.Y. State Dep't of Educ.*, 8 F.Supp.2d 330, 335 (S.D.N.Y.1998) (dismissing claims against state agency that were based on Education Law). Therefore, the Article 89 claim will be dismissed as against the DOE.

### 2. Section 1983

■ In their *third* cause of action, plaintiffs claim that, pursuant to Section 1983, defendants deprived Ibrahim of rights guaranteed him under the IDEA. It is well established that neither the state nor its agencies, including the DOE, can be sued under Section 1983, *see Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir.1998), unless the relief sought is prospective and injunctive in nature, *Gaby v. Bd. of Trustees of Cmty. Technical Colls.*, 348 F.3d 62, 63 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 and n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Because the relief sought here by plaintiffs is entirely monetary, *see infra*, the Section 1983 claim will be dismissed as against the DOE.

### 3. ADA

■ In their *fourth* cause of action, plaintiffs claim that defendants discriminated against Ibrahim on the basis of his disability in violation of the ADA. In *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Supreme Court held that the Eleventh Amendment barred claims for monetary damages under Title I of the ADA, but declined to answer whether such immunity barred suit against the state for claims made under Title II, under which plaintiffs bring suit and which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132. Following *Garrett*, the Second Circuit did, however, weigh in on the issue, holding that the Eleventh Amendment permits private suits for money damages under Title II, but only insofar as a "plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir.2001).[1] Here, plaintiffs merely allege that, by "failing to reasonably accommodate Ibrahim's disabilities, ... [defendants] have discriminated against [him] on the basis of his disability." (Docket No. 1, ¶ 48.) Plaintiffs fail to specifically allege that defendants' conduct was driven by "discriminatory animus or ill will." Therefore, the ADA claim will be dismissed as against the DOE.[2] *See Harris v. N.Y. State Dep't of Health*, 202 F.Supp.2d 143, 174–75 (S.D.N.Y.2002) (dismissing Title II claim where plaintiff failed to plead discriminatory animus or ill will).

## C.  *Relief Requested: IDEA Claim*

■  Plaintiffs' *first* cause of action under the IDEA against the DOE is not barred by the Eleventh Amendment analysis above. *See Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 480 (2d Cir.2002) (noting that state has waived sovereign immunity for claims brought pursuant to the IDEA). However, the viability of the IDEA claim, in this case, is dependent upon the type of relief sought. While it is clear that IDEA plaintiffs can recover compensatory education, if it is appropriate, *see Garro v. State of Conn.*, 23 F.3d 734, 736 (2d Cir.1994), the Second Circuit has clearly declared that monetary damages are improper under the statute, *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir.2002) ("We therefore hold that monetary damages are not available under the IDEA").

In the complaint, plaintiffs seek "compensatory education and money damages in the amount of $75,000.000," as well as "the costs and expenses of maintaining this action, and the underlying administrative proceedings necessary to bring this action[,] including reasonable attorneys' fees[.]" (Docket No. 1, Prayer For Relief, ¶¶ (a)-(d)). While this language, splitting grammatical and semantical hairs, appears to indicate that plaintiffs seek compensatory education on one hand, and money dam-

1.  Suits seeking injunctive relief do not come within the purview of *Garcia*. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003).

2.  It should be noted that plaintiffs' claim under the Rehabilitation Act, which is considered Spending Clause legislation, though asserted under a section similar to Title II of the ADA, is not barred by the Eleventh Amendment. The Rehabilitation Act contains a section specifically targeted by Congress at eliminating states' immunity. *See* 42 U.S.C. § 2000d–7. In order for this section to abrogate immunity, however, a state must be aware that in exchange for receiving federal assistance it is waiving its Eleventh Amendment protection. *Garcia*, 280 F.3d at 114. The date on which courts impute this knowl-

edge to states is of some debate, with some using February 21, 2001, the date of the *Garrett* decision, *Smith v. State Univ. of N.Y.*, No. 00–CV–1454, available at 2003 WL 1937208, at * 7 (N.D.N.Y. Apr.23, 2003); *Kilcullen v. N.Y. State Dep't of Labor*, No. 97–CV–484, available at 2003 WL 1220875 (N.D.N.Y. Mar.13, 2003), and others using September 25, 2001, the date of the *Garcia* decision, *Harris*, 202 F.Supp.2d at 177; *Denmeade v. King*, No. 00–CV–0407E(F), available at 2002 WL 31018148 (W.D.N.Y. Aug.1, 2002). Both decisions, however, were issued prior to the complained of actions in this case, so it cannot be said that New York State was unaware of Section 2000d–7 and did not therefore waive its Eleventh Amendment immunity in Rehabilitation Act cases.

ages in the amount of $75,000 on the other, their memorandum of law in opposition to the DOE's motion to dismiss indicates otherwise. Particularly, in the memorandum, plaintiffs claim that the monetary amount, as trebled, "*represent[s]* compensatory education *and* treble money damages[.]" (Docket No. 26, p. 1.) (emphasis added). Despite plaintiffs' attempt to manipulate the teachings of *Garro* and *Polera* by affixing the "compensatory education" label to the amount sought, it is clear that only monetary damages are sought. Accordingly, the IDEA claim will be dismissed against the DOE.

That plaintiffs are unable to obtain the monetary damages under the IDEA, however, does not mean that they cannot enforce IDEA rights and obtain such damages against the Board. In *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141 (2d Cir.1983), the Second Circuit held that Section 1983 may be used to recover monetary damages for violations of the Education of the Handicapped Act ("EHA"), the IDEA's predecessor. *Id.* at 148. This holding was bolstered in 1986, when Congress amended the EHA to implicitly overrule *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), in which the Supreme Court held that the exclusive remedy for EHA violations was the statute itself. A provision in the amended EHA declaring that aggrieved parties may have their rights vindicated under other laws, coupled with specific statements in the legislative history of the statute, prompted the Second Circuit to thereafter affirmatively "hold that parents are entitled to

bring a § 1983 action based on the alleged violations of the EHA." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987).

■ Though the IDEA has a provision similar to the one in the EHA, 20 U.S.C. § 1415(*l*), the court in *Polera*, while noting its prior holding that Section 1983 may be used to secure monetary damages for violations of the IDEA's predecessor, did not have occasion to rule on whether such holding could also be applied to the IDEA. Subsequently, however, the court specifically endorsed the idea that "a plaintiff may recover monetary damages for a violation of the IDEA pursuant to § 1983." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 786 n. 14 (2d Cir.2002). District courts within the Second Circuit, both before and after *Taylor*, have reached the same conclusion. *See, e.g., B.H. v. Southington Bd. of Educ.*, 273 F.Supp.2d 194, 204 (D.Conn. 2003); *A.A. v. Bd. of Educ., Cent. Islip Union Free Sch. Dist.*, 255 F.Supp.2d 119, 124 (E.D.N.Y.2003); *Butler v. S. Glens Falls Cent. Sch. Dist.*, 106 F.Supp.2d 414, 420 (N.D.N.Y.2000); *R.B. ex rel. L.B. v. Bd. of Educ. of City of N.Y.*, 99 F.Supp.2d 411, 417–18 (S.D.N.Y.2000); *Cappillino v. Hyde Park Cent. Sch. Dist.*, 40 F.Supp.2d 513, 515–16 (S.D.N.Y.1999). Therefore, although plaintiffs cannot seek monetary damages under the IDEA itself,[3] such relief is available via a Section 1983 action against the Board (not the DOE, *see supra*) to enforce Ibrahim's IDEA rights.[4]

### D. *Rehabilitation Act Claim*

The *fifth* cause of action under the Rehabilitation Act is also not specifically pro-

---

**3.** While the IDEA does expressly provide for an award of attorney's fees, 20 U.S.C. § 1415(i)(3)(A)-(G), its mandates are substantially similar to 42 U.S.C. § 1988, which provides for the same to prevailing parties in Section 1983 actions. Because plaintiffs' Section 1983 claim will require virtually the same proof as would have been required under the IDEA, it follows that plaintiffs, if they prevail, may seek fees under Section 1988.

**4.** Even had plaintiffs merely sought compensatory education under the IDEA, it is questionable whether such relief would be available, since Ibrahim and his family have moved out of the district, and do not allege an intent or any plans to return.

hibited by the Eleventh Amendment, *see supra* note 2, and/or by the nature of relief requested by plaintiffs. Therefore, as alleged in the complaint, the Rehabilitation Act claim must be discussed. Even though the ADA claim is not viable against the DOE (*see supra*), it too will be discussed because it requires the same element, the absence of which would be fatal to the Rehabilitation Act claim against the DOE.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). Likewise, the ADA provides for an identical prohibition, but without any reference to "receiving Federal financial assistance." 42 U.S.C. § 12132. "Plaintiffs who allege violations under the ADA ... and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation." *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir.2002). From the language used by plaintiffs in the complaint, it is difficult to ascertain under which theory they are proceeding. *See* Docket No. 1, ¶ 55 ("Defendants, in failing to reasonably accommodate Ibrahim's disabilities[,] have discriminated against [him] on the basis of his disability against both the less severely disabled, and the non-disabled"). The most reasonable reading of the complaint, and the reading most compatible with the remainder of the complaint, is that a rea-

sonable accommodation claim is being advanced. Such appears to also be the focus of the parties' briefing.

It is also arguable, however, that a disparate impact claim is being advanced, as evidenced by the express reference to the "less severely disabled" and "the non-disabled" comparison groups. No allegations whatsoever have been offered, neither in the form of statistical nor anecdotal evidence, as support for the alleged disparate impact. Even at the liberal pleading phase of the litigation, the above bare, conclusory allegation cannot suffice. In any event, to sustain a reasonable accommodation claim, the Second Circuit has made clear that evidence of disparate impact is not needed. *See Henrietta D. v. Bloomberg*, 331 F.3d at 276–77; *see also P.C. v. McLaughlin*, 913 F.2d 1033, 1041 (2d Cir.1990) ("The Rehabilitation Act does not require all handicapped persons to be provided with identical benefits"). Thus, it will be assumed that plaintiffs are advancing only a reasonable accommodation claim under the Rehabilitation Act.

"At this early stage of the litigation, plaintiffs' complaint is sufficient to withstand dismissal if it alleges that (1) [Ibrahim] has a disability for the purposes of Section 504/ADA, (2)[he] is otherwise qualified for the benefit that has been denied, and (3)[he] has been denied the benefit by reason of [his] disability." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146–47 (2d Cir.2002). The DOE, relying upon *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998), argues that the Rehabilitation Act claims should be dismissed "[w]hen, as in this case, plaintiffs are in essence challenging the adequacy of the educational services, and not any illegal discrimination, their claim[s] under the ADA and [S]ection 504 must be dismissed." (Docket No. 19, p. 21.)[5]

---

**5.** The DOE actually cites *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 410, 99 S.Ct.

2361, 60 L.Ed.2d 980 (1979), but a cursory

■ The Second Circuit has interpreted its decision in *Pfrommer* as "distinguish[ing] between (i) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits." *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir.2000) (citing, *inter alia*, *Pfrommer*, 148 F.3d at 83). The former is mandated by the ADA and the Rehabilitation Act; the latter is not. In other words, while reasonable accommodations must be offered to ensure meaningful access to the program, the statutes do not require that substantial changes be made to the program itself. *See J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir.2000) (quoting *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 302–06, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). Therefore, under the disability discrimination statutes, a plaintiff may challenge access to, but not the content of, the programs at issue.

Such is the distinction between claims made under the disability discrimination statutes and claims made under the IDEA. Though the statutes are to be read in tandem, *id.* at 70 ("In the education field, the Rehabilitation Act [and the ADA] complement[ ] the IDEA and the corresponding [state] regulations"), it is clear that the former require a showing not necessary under the latter. As the Eighth Circuit has explained:

"That a court may ... come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required [under IDEA], is not necessarily the same thing as holding that a [disabled] child has been discriminated against solely by rea-

son of his or her [disability]. Therefore, something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."

*Wenger v. Canastota Cent. Sch. Dist.*, 979 F.Supp. 147, 152 (N.D.N.Y.1997) (quoting *Monahan v. Neb.*, 687 F.2d 1164, 1170 (8th Cir.1982)); *see also R.B. ex rel. L.B.*, 99 F.Supp.2d at 419 (stating with regards to both the ADA and the Rehabilitation Act, "[i]n the special education context, courts have held that a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability; a plaintiff must show that defendants acted with bad faith or gross misjudgment").

■ Here, plaintiffs make no allegations in the complaint that the DOE acted with bad faith or gross misjudgment. Rather, the meat of the disability discrimination claims is substantially the same as that of the IDEA claim—allegations that the DOE failed to make necessary evaluations to develop a proper IEP for Ibrahim, and that it failed to offer prompt administrative review. These are essentially challenges to the program itself, not of any type of discriminatory decisions. Plaintiffs would be hard-pressed to argue Ibrahim was denied meaningful access to a federally funded program. Indeed, their challenge is more related to the substantive contours of what would comprise the program as applied to Ibrahim. Even assuming that certain components requested by plaintiffs were rejected, or that the DOE

---

review of the page cited in *Davis* reveals no such direct espousal of the principle for which it is cited. *Pfrommer*, on the other hand, which the DOE does cite in the preceding paragraph, contains language nearly identical to that used by the DOE in its memoran-

dum of law. 148 F.3d at 84 ("[I]n this case, what DOE ultimately seeks to challenge is not illegal discrimination against the disabled, but the substance of the services provided to him through VESID").

unreasonably failed to utilize or adopt certain components, plaintiffs' challenge can only be said to be directed at the substance or adequacy of the program, and not to any decision to deprive Ibrahim of access to the program itself. Because no allegations of bad faith or gross misjudgment are made with respect to the Rehabilitation Act claim, it will be dismissed against the DOE. As to the substance or adequacy of the Board's actions and of what was offered or not offered to Ibrahim, plaintiffs, assuming they can put forth the necessary proof, may find proper recourse through their Section 1983 claim to enforce Ibrahim's rights under the IDEA. *See Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1232–33 (S.D.N.Y.2003) (where a plaintiff is alleging incompetent treatment, and not failure to provide meaningful access to a program, remedy is found through Section 1983, not a disability discrimination statute).

### E. *The Board's Cross–Claim*

The DOE has also moved to dismiss the Board's cross-claim, in which the Board seeks an order partially reversing or modifying that part of the DOE'S state review officer's determination that the denial of education should be taken into account when developing future educational plans for Ibrahim. The basis of the cross-claim is the Board's contention that future years had not yet been the subject of any due process request by plaintiffs. The DOE moves to dismiss the cross-claim on the bases that such part of the state review officer's order was spawned by the District's own request for a ruling on the IAES, and because the state review officer is vested with considerable discretion in reaching his decisions.

Without delving into the merits or scope of the state review officer's decision, the cross-claim will be dismissed. The Board urges that the DOE remain in this case as "a proper party to the action under the IDEA." (Docket No. 29, p. 2.) However, plaintiffs' claim under IDEA will be dismissed against the DOE, and as the Board admits, the DOE is not "a necessary party to this action for the purpose of enabling the Court to reverse the Decision rendered by the State Review Officer." *Id.* Though the cross-claim is dismissed for the purposes of excusing the DOE from the case, the Board will be permitted to argue for its substance in the defense of plaintiffs' remaining claims.

### IV. *CONCLUSION*

None of plaintiffs' claims are viable against the Department of Education. Eleventh Amendment immunity attaches to the claims under Article 89 of the New York State Education Law, 42 U.S.C. § 1983, and American with Disabilities Act. The Individuals with Disabilities Act and the Rehabilitation Act claims must be dismissed because under the IDEA, plaintiffs cannot obtain the relief they seek, and under the Rehabilitation Act, allegations of bad faith and gross misjudgment are missing from the complaint. The Board's cross-claim against the DOE will also be dismissed.

Accordingly, it is

ORDERED that

1. Defendant State of New York Department of Education's motion to dismiss the complaint is GRANTED;

2. Defendant State of New York Department of Education's motion to dismiss the cross-claim is GRANTED; and

3. The complaint and cross-claim are DISMISSED as against defendant State of New York Department of Education.

IT IS SO ORDERED.